[Civ. No. 17703.   First Dist., Div. Two.   Feb. 25, 1958.]

TROY EAGANS, Respondent, v. KEY SYSTEM TRANSIT LINES (a Corporation) et al., Appellants.

Donahue, Richards & Gallagher for Appellants.

Jeremiah F. O'Neill, Jr., Robert A. Kaiser, Kaiser & O'Neill and J. F. Vokoun, Jr., for Respondent.

BRAZIL, J. pro tem.*—This appeal is by the defendant bus company and its driver from a judgment of $30,000 entered pursuant to a jury verdict, as such judgment was modified by the trial court from an original amount of $40,000 in its ruling on defendants' motion for a new trial. The trial took six days, the record of which discloses an extensive in-

*Assigned by Chairman of Judicial Council.

quiry by both sides of the facts of the case, particularly with relation to damages.

The evidence need not here be set forth in great detail, except insofar as it may be helpful in understanding the size of the judgment, for the appellants have no quarrel with any of the trial court's rulings, the instructions or the jury's finding on liability. They claim that the verdict as regards damages is without foundation in the evidence and therefore under the circumstances it is a question of law, not of fact, whether the judgment finds any support in the evidence.

Troy Eagans, a husky, young (32) driver of heavy duty trucks, a former army paratrooper, on returning in his car from his job at Bigge Drayage Company, about 5 in the afternoon of July 28, 1955, got into an accident, which was the basis of his action against the defendants. While stopped in traffic on an Oakland street, with his foot on the brake, he was struck from behind by one of defendant's buses. The collision was hard enough to skid the plaintiff's car forward about a car length, the skid marks of that length appearing on the pavement. When the accident occurred, plaintiff having no notice of its imminence, his head was jerked back and then forward, his arm went through the steering wheel and his hard McDonald hat was jerked from his head and fell to the floor.

Right at the scene of the accident it did not appear that the plaintiff was seriously, if at all, hurt for the most he says of his feeling at that time and place is that he "was not comfortable." After a few minutes discussion, looking around to see the extent of the damage to the two vehicles and the exchange of driver information, the two drivers got into their motor vehicles and went their respective ways. A few minutes later and several blocks from the place where the accident occurred, the plaintiff stopped at his mother-in-law's house to call his wife to let her know he would be late getting home. While telephoning he fell to the floor, although not unconscious; his head started aching severely, like it was splitting open, and he became aware of low back pain. Soon thereafter he went to a hospital for emergency treatment, returning home the same night with a hard collar applied to his neck.

On the advice of a doctor, he entered the Eden Hospital on August 2d, and there he stayed in bed under treatment for 17 days. His complaints were severe pain in the neck area, violent headaches and pain in the lower back. X-ray pictures taken then and on several occasions later all the way up to

time of trial showed no fractures or visible objective evidence of injury. Just about all the time he was in the hospital, he was under heavy traction, about 17 pounds pulling on his chin and 11 or 12 pounds pulling from his waist. The hospital records disclose a most painful and uncomfortable stay there, exemplified by the fact that he was given medication and injections from empirin codeine compound to hypnotic drugs, no less than 129 times, quite obviously in attempts to relieve pain and suffering. He left the hospital in a wheel chair, feeling little if any better, to go home, where he stayed in bed for eight or nine days more. His wife said he was in pain most of the time; that he had a terrible time sleeping, and would often wake her up crying and screaming from pain. Other witnesses testified that Mr. Eagans had to sleep on a plyboard mattress, that he perspired excessively and that he acted in a manner far different from that before the accident.

On September 25, 1955, plaintiff went back to work at Bigge Drayage Company, working only one day because he "couldn't take it any more."

On October 3, 1955, plaintiff went back to work on a regular basis for the same employer, the work, however, being of a very easy type compared to what he had been doing before the first accident. While on the job he said he was always uncomfortable with headaches and backaches. On coming home at night he had great difficulty in getting up the stairs, being assisted in making the climb by his wife who would meet him at the bottom of the stairs.

And then there was another accident; and that second accident became an integral part of the trial, even though all agree that defendants had no connection whatever with it. It was the subject of lengthy examination to determine what portion of plaintiff's present complaints were due to it and not to the first accident. Because the second was far more violent than the first, appellants claim that as a matter of law the damages awarded are for all plaintiff's injuries without any deduction whatever for that portion of his injuries attributable to the second accident.

On November 18, 1955, plaintiff was driving a tractor-trailer type truck with a load on the trailer weighing 19 tons. Someone miscalculated either the height of the trailer or the clearance of the underpass on Eastshore Freeway. Going at a speed of 28 miles an hour, the tractor cleared the ceiling of the underpass but the trailer did not. The result, of course, was a violent crash, the trailer being pulled completely loose

from the tractor at the fifth wheel assembly, and the undamaged tractor continuing on for 90 feet or so. The appellants established that the contact of the top of the heavy trailer with the structure of the underpass resulted in flattening 10 steel rivet heads, tearing out a three-fourth inch sliver of metal six inches long and bending a 40-ton steel girder one-half an inch out of line. For a while the plaintiff sat in the cab of the tractor unable to get out because his legs wouldn't work. They felt numb. In this accident he said he hurt his back, but not his neck.

Mr. Eagans was thereupon taken to the Highland Emergency Hospital, given a shot of pain reliever, X-rayed and then discharged about five hours after entry. The plaintiff was fired from his truck driving job on the Friday the second accident happened, so he went to the union hall on the next Monday and got a job with Farnsworth and Ruggles, which job required him to lift 50 pound cartons. After working a full day, he found that he just couldn't do that kind of work for as he said, ''My back was killing me and so was my head.'' Thereafter, the plaintiff tried light delivery work for a few days, but was never able because of his physical and mental condition to go back to the kind of work he knew and liked the best—unrestricted truck driving. When the matter came on for trial in October, 1956, the plaintiff was still wearing a back brace most of the time and he was unable to do anything other than the lightest kind of work. After the second accident and for about six months plaintiff received compensation of an industrial nature for injuries incurred in that accident. For about 30 days in January and February, plaintiff wore a full body cast.

From the briefs, it does not appear that appellants maintain that the award is too much for plaintiff's total injuries, but rather that as a matter of law the jury must have assessed all the damages to the defendants, even though it is obvious that there is no responsibility at all on them to pay for what happened to plaintiff as a result of the second accident. Appellants' position that they were assessed for damages resulting from both collisions is born more of disappointment in the result than from a consideration of the evidence and the law, particularly in view of the fact that it is not the province of this court to pass on the weight of the evidence or determine the credibility of the witnesses. An appeal is not a retrial.

The appellants appear greatly impressed with the fact that the second accident was far and away more violent than the

first; and so, they reason, the amount of the injury in the second must be far greater than that resulting from the first one. The jury was required to judge the credibility of the witnesses, to pass on all questions of fact and to return a verdict based upon judgment, not speculation, and in accordance with the law as stated in the instructions. The jury apparently did not follow appellants' reasoning, nor was it in the proper exercise of its duty required to do so. It is a matter of common knowledge that many a person has walked away unscathed from a violent accident, and others, not so fortunate, have suffered greatly from what to all intents and purposes was but a minor accident. It was not unreasonable to find that greater injury came from the lesser collision for the further reason that the stress or strain to plaintiff came from different directions. In the first accident, plaintiff was struck unannounced from the rear, causing his head to first jerk backward and then forward. In the second one we have the unusual situation of having a pulling force from the rear, which, of course, would throw plaintiff's head forward and then backward. In the second accident, there would not be the resistance of the automobile seat to the first violent movement of the body.

The transcript of the proceedings discloses that the trial judge accurately and repeatedly instructed the jury that damages resulting from the second accident could not be assessed against the appellants. There isn't anything apparent from the record that could lead to a finding that the jury failed to follow the law as set forth in the instructions. The jury in this case listened long, and presumably patiently, to a parade of witnesses who testified to the condition of the plaintiff before and after the first accident and just before and after the second one right up to the time of trial. Seven doctors, each well qualified, including two of the best known psychiatrists in California, testified at length on all phases of plaintiff's physical and mental condition, present, past and future, expressing opinions and giving reasons therefor. There was a conflict in the opinions and testimony of these doctors but that conflict is one to be resolved by the jury sworn to try the case and not by an appellate court. One psychiatrist expressed an opinion that the plaintiff as a result of the first accident suffered from neurosis, with which opinion the other psychiatrist disagreed. Plaintiff's attending physician described him as a beaten, pitiful man who even before the second accident had given up hope. Two of the doctors ex-

pressed the opinion that 75 per cent or more of plaintiff's present condition was attributable to the first accident. The defendants did not attempt to find out from their doctor witnesses what percentage of injury resulted from each accident.

Relief from allegedly excessive damages is available only when it appears that the damages awarded have been given under influence of passion or prejudice. (Code Civ. Proc., § 657, subd. 5.)   There is nothing at all in the record to indicate that the verdict was the result of passion or prejudice. To the contrary, the subject of injury resulting from each of the two separate accidents was exhaustively inquired into by both sides. The amount of damages which may be awarded to the plaintiff is first committed to the sound discretion of the jury, and next to the trial judge ruling on a motion for new trial.

No error appears in the trial and no reason suggests itself from the record or the arguments set forth in the briefs on appeal why the judgment should be disturbed.

Judgment affirmed.

Dooling, Acting P. J., and Draper, J., concurred.

A petition for a rehearing was denied March 27, 1958.